UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JAMES WHITFORD,

                                        Plaintiff,

-vs-                                                                    Case No.  6:05-cv-520-Orl-KRS

COMMISSIONER OF SOCIAL
SECURITY,

                                        Defendant.
_____

ORDER

        This cause came on for consideration without oral argument on the Complaint filed by

James Whitford, seeking review of the final decision of the Commissioner of Social Security

denying his claim for social security disability benefits.  Doc. No. 1.  The Commissioner answered

the Complaint and filed a certified copy of the transcript of the proceedings before the Social

Security Administration.  Doc. Nos. 11-12.  This matter has been referred to me for disposition

pursuant to 28 U.S.C. § 636(c).

I.      PROCEDURAL HISTORY.

        On October 24, 2002, Whitford filed an application for a period of disability and disability

insurance benefits under the Federal Old Age, Survivors and Disability Insurance Program

(OASDI), 42 U.S.C. § 401, *et seq*., alleging a disability onset date of September 20, 2002.  TR. 35-

37.  Whitford's claim was denied, initially and upon reconsideration.

Whitford requested a hearing before an administrative law judge (ALJ), which was held on July 21, 2004.  Whitford, who was represented by an attorney, testified at the hearing.   The ALJ also elicited the testimony of a vocational expert (VE).  TR. 189-208.

The ALJ issued his decision on October 29, 2004.  After considering the testimony and the medical evidence presented, the ALJ found that Whitford was insured under OASDI through the date of the decision.  He concluded that Whitford had not engaged in substantial gainful activity since the alleged onset date of his disability.  TR. 16.  The ALJ concluded that the medical evidence indicated that Whitford suffered from degenerative disc disease (DDD) and hypertension. The ALJ determined that Whitford's impairments were severe but that they did not meet or equal any of the impairments listed in the applicable social security regulations.  *Id*.

The ALJ found that Whitford had the residual functional capacity (RFC) to perform a significant range of light work.[1]  TR. 19-20.  Specifically, the ALJ determined that Whitford "retain[ed] the functional capacity for light work with a sit/stand option[,]" and that he could "occasionally lift up to 20 pounds, frequently lift up to 10 pounds, . . . occasionally perform postural activities[,] . . . sit for 2 ½ hours at a time, stand 2 hours at a time, and walk up to 1 ½ hours."  TR. 18.  The ALJ noted that this assessment "grants the claimant the benefit of the doubt, as DDS findings place the claimant at a full range of light work . . . ."  TR. 19.

---

[1] Pursuant to 20 C.F.R. § 404.1567(b), light work is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  The regulation further provides that "[e]ven though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  *Id*.

The ALJ further found that Whitford's allegations regarding his limitations were not totally credible.  TR. 21.  In particular, the ALJ noted that Whitford's hypertension was stable, his back limitations were minimal at the time he had epidural steroid injections, and no follow-up to those injections was reflected in the record, and no physician had placed him on any work restrictions. Furthermore, Whitford worked part-time directing traffic during Daytona's Race Week in July 2004 with no reported difficulty.  TR. 18.

The ALJ determined that Whitford was unable to return to his past relevant work.  TR. 19. The ALJ further found that Whitford was "an individual closely approaching advanced age" and that he had a high school (or high school equivalent) education and no transferable skills from any past relevant work.  *Id*.  Because Whitford could not perform all or substantially all of the requirements of light work, the ALJ relied on the testimony of a VE to determine whether work existed in significant numbers in the national economy that Whitford was able to perform.  TR. 20.

Based on the testimony of the VE, the ALJ found that Whitford was "capable of making a successful adjustment to work that exists in significant numbers in the national economy."  *Id*. Specifically, the ALJ noted that Whitford could perform the following jobs:  (1) office helper; (2) assembler of small parts; and (3) surveillance systems monitor.  Hence, the ALJ determined that Whitford was not disabled within the framework of Rule 202.14 of the Medical Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P., App. 2 (the "grids").  TR. 20-21.

Whitford requested review of the ALJ's decision by the Appeals Council.  TR. 11.  On February 4, 2005, the Appeals Council denied Whitford's request for review.  TR. 6-9.  This appeal timely followed.  Doc. No. 1.

-3-

## II.      JURISDICTION.

The ALJ's decision become the final decision of the SSA once the Appeals Council denied

Whitford's request for review.  *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); 20

C.F.R. § 404.981.  This Court has jurisdiction over the present appeal under 42 U.S.C. § 405(g).

## III.     STATEMENT OF FACTS.

A.      *Whitford's Testimony and Written Statements*.

Whitford was born on November 17, 1949.  TR. 193.  Whitford graduated from high

school and participated in some law enforcement training.  TR. 193-94.  Whitford is six feet tall

and weighed 298 pounds at the time of his hearing.  *Id*.

Whitford previously worked as a service technician for Bell South "[i]nstall[ing]

telephones, running phone lines, driving poles, [and] digging."  TR. 198.  Whitford last worked at

Bell South in September 2002.  He could no longer perform this job due to his permanent medical

restrictions.  *Id*.

Whitford had worked part-time as a police office with the Daytona Beach Police

Department since March 1973.  TR. 194.  At the time of the hearing, Whitford was working only

for special events, like "Race Week, Bike, Week, [and] Spring Break."  *Id*.    Whitford was

certified to handle firearms, and some of the events he worked required him to carry a firearm. TR.

195.  During his work at special events, Whitford's responsibilities included directing traffic or

driving a relief car to deliver water.  He last worked at an event in July 2004, at which time he

worked approximately twenty-five hours over a four day period.  *Id.*

-4-

Whitford had lower back pain that radiated down his left leg.  TR. 201.  If he twisted the wrong way, he would lose feeling in his left leg.  TR. 61, 201-02.  Some days the pain was worse than other days.  TR. 201.  He sometimes turned down work that required a lot of standing or a lot of sitting.  TR. 202.  Pain sometimes awoke him from his sleep.  TR. 50, 62, 64.

On a typical day, Whitford awoke at about 9:00 to 9:15 a.m.  TR. 196.  He was able to help his wife clear the dishes from the table and perform similar chores.  TR. 197.  However, Whitford was unable to assist in any household chores that required bending, sweeping, or kneeling.  TR. 65.  His wife did most of the cooking and shopping.  TR. 69-70.  Whitford testified that he was unable to mow his yard and that he could no longer fish from a boat because of back pain.  TR. 197.  Whitford did not participate in any social activities.  TR. 198.

Whitford was able to sit for about an hour in a normal chair.  TR. 199.  He did not require the use of an assistive device for walking.  He was unable to walk for more than a "couple hundred yards" without needing to stop.  TR. 199-200.  Whitford stated that he could stand for about forty-five minutes to an hour without needing to sit down.  TR. 200.

Whitford could lift approximately fifteen pounds without experiencing any pain or discomfort.  TR. 200.  He was unable to bend over.  He needed help getting up in the bathtub.  He could not tie his shoes.  TR. 62, 200.  "Movements such as twisting, bending, stooping, climbing ladders, carrying heavy objects, siting for long periods[,] . . . excessive walking, [and] using a shovel . . . all cause[d] pain[.]"  TR. 64.

-5-

B.      *VE Testimony*.

The ALJ posed the following hypothetical to the VE at Whitford's hearing:

Assume that I have an individual for consideration between the ages of 52 and 55. Assume they were high school educated. Assume that they were limited to light work. Assume that the person – now, when I speak of sitting periods I'm speaking of the maximum time that any person would be required to sit or stand. . . .  For example, if they have a job that I indicated would have been sit or stand after two hours it would mean that within that period of time they would have to . . . have the option of doing it but they might only sit for 30 minutes or an hour or an hour–and–a–half.  So in evaluating these times take into consideration any other possible jobs.  Take into consideration this is the maximum period of time they would have to sit at any one time or stand or walk.  Assume the light residual functional capacity.  Assume that in the seated position that the person would . . . have to be allowed to get up and stretch within two to two–and–a–half hours maximum.  They may be . . . two hours maybe or they can sit two–and–a–half hours or two hours and five minutes.  The same would be standing.  Standing would be a maximum of two hours at any one time without being allowed to sit and rest.  The walking would be up to an hour, an hour–and–a–half.  Would there be any unskilled light jobs that the individual could do with those limitations?

TR. 205-06.  The hypothetical claimant also would not be able to transfer skills from any of his past work.  TR. 206.  The VE responded that this hypothetical claimant could perform the following jobs, each of which is unskilled and required a light or sedentary level of exertion:  (1) officer helper; (2) assembler of small parts; and (3) surveillance systems monitor.  TR. 206-07. The VE further testified that if the claimant was unable to work one or two days the first month of employment, employers would look on that "in a negative fashion."  TR. 207.

C.      *Medical Evidence*.

Whitford was treated by Wagid Guirgis, M.D., for various ailments from May 2001 to April 2004.  TR. 79-80, 82-87, 89-92, 160-66, 175, 179-82.  On May 15, 2001, Dr. Guirgis

-6-

assessed Whitford with hypertension, hyperlipidemia,[2] and hypothyroidism.[3]  TR. 91-92.  In

September 2001, Dr. Guirgis noted that Whitford's hypertension was uncontrolled, but he wrote

that hypertension was controlled with medication in October 2001.  TR. 89-90.

On October 16, 2001, Whitford was examined by M.W. McDonough, DPM (doctor of

podiatric medicine).  Dr. McDonough noted that Whitford presented with a hallux valgus

deformity[4] of a joint in his left foot. TR. 88.

On June 7, 2002, Whitford presented to Dr. Guirgis with complaints of pain in his left hip,

which had lasted for several days.  TR. 82-83.

On July 10, 2002, Whitford was treated by Richard K. Gaines, M.D.  TR. 99-100.

Whitford presented with complaints of low back and left hip pain that had lasted for approximately

two months.  Whitford also reported problems with climbing, carrying ladders, and kneeling.  Dr.

Gaines observed that Whitford had a restricted active range of motion (ROM) in his lumbar spine

and mild palpable tenderness over his left lower lumbar region and sacroiliac joint.  Whitford's

motor strength was normal, and he had no sensory deficits.  His deep tendon reflexes were

symmetric.  TR. 99.

---

[2] "The presence of an abnormally large amount of lipids in the circulating blood." STEDMAN'S MEDICAL DICTIONARY 826, 985 (26th ed. 1995) (STEDMAN'S).

[3] "Diminished production of thyroid hormone, leading to clinical manifestations of thyroid insufficiency, including low metabolic rate, tendency to weight gain, somnolence and sometimes myxedema." STEDMAN'S at 841.

[4] "[A]n abnormal deviation of the big toe away from the midline of the body or toward the other toes of the foot that is associated especially with the wearing of ill-fitting shoes . . . ." *See* MEDLINEPLUS, http://www2.merriam-webster.com/cgi-bin/mwmednlm?book =Medical&va=Hallux%20Valgus (last visited May 12, 2006).

Dr. Gaines remarked that x-rays of Whitford's lumbosacral spine revealed evidence of mild degenerative change.  Dr. Gaines' assessment was musculoligamentous strain of the lumbar spine. Dr. Gaines prescribed Voltaren and recommended physical therapy.  TR. 100.

Whitford underwent physical therapy at HealthSouth from July 2002 to September 2002. TR. 101-18.  On July 15, 2002, Whitford rated his pain as a four on a scale of one to ten.  He indicated that his pain level ranged from two to eight on a ten-point scale.  TR. 115.  On July 17, 2002, Tammy K. Iglehart, PT, noted that Whitford tolerated his treatment/therapeutic session with minimal complaints of pain and difficulty.  TR. 114.  On July 24, 2002, Iglehart noted that Whitford's pain decreased with exercise.  TR. 108.  However, on July 26, 2002, Iglehart reported that Whitford's pain increased with work-related activities.  TR. 106.  On September 13, 2002, Iglehart noted that Whitford's overall condition had worsened.  TR. 101.  Iglehart also reported that Whitford had not been fully compliant with his treatment and that he had attendance issues. TR. 102.

On August 9, 2002, Whitford presented to Dr. Gaines with continued complaints of low back and left leg pain.  Dr. Gaines assessed Whitford with musculoligamentous strain of the lumbar spine and degenerative disc disease of the lumbar spine with possible radiculopathy.[5]  TR. 97.

---

[5] "Disorder of the spinal nerve roots."  STEDMAN'S at 1484.

On August 15, 2002, S. Pineiro, D.O., reviewed an MRI of Whitford's lumbar spine.  TR. 96.  Dr. Pineiro observed mild degenerative hypertrophic disease of the articular facets[6] at L3/L4, mild degenerative disc disease with small marginal osteophytes[7] at L4/L5, and mild degenerative disc disease with mild annular bulging at L5/S1.  Dr. Pineiro's conclusion was degenerative hypertrophic disease of the articular facets most pronounced at L4/L5 with moderate neural foraminal narrowing.  *Id*.

On August 19, 2002, Dr. Gaines assessed Whitford with degenerative disc disease of the lumbar spine with facet arthrosis.[8]  Dr. Gaines place Whitford on "modified work duty to include no digging, lifting, or climbing."  TR. 94.

On January 20, 2003, Whitford was treated at Memorial Hospital for complaints of dizziness, lightheadedness, nausea, back pain, abdominal pain, and shortness of breath.  TR. 168-74.

On January 27, 2003, Dr. Gaines observed that Whitford had loss of motion in his spine that caused pain and stenosis.[9]  Dr. Gaines noted that Whitford's grip strength, fine dexterity, gait,

---

[6] "[A] relatively small articular surface of a bone, especially a vertebra."  STEDMAN'S at 619.

[7] "[A] pathological bony outgrowth . . . ."  *See* MEDLINEPLUS, http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=osteophytes (last visited May 12, 2006).

[8] "A degenerative affection of a joint."  STEDMAN'S at 151.

[9] "A stricture of any canal . . . ."  STEDMAN'S at 1673.

and station were normal.  Dr. Gaines opined that Whitford did not need an assistive device for ambulation.  TR. 128.

In March 2003, Whitford presented to Dr. Gaines with complaints of left lateral hip pain that radiated to his ankle.   Dr. Gaines observed that Whitford had minimally restricted ROM in his lumbar spine.  Dr. Gaines' assessment was spinal stenosis.  TR. 167.

On April 9, 2003, Whitford was treated by Kirit Bhalani, M.D., for complaints of lower back and left leg pain.  TR. 185-86.  Whitford reported that he suffered from constant pain in his left buttock that ranged from three to eight in severity on a ten-point scale.  He described the pain as throbbing, aching, sharp, and stabbing, and explained that it worsened with prolonged standing, twisting, and walking.  TR. 185.  Whitford indicated that the pain in his leg traveled all the way down to his ankle.  He described the pain in his left leg as a "deep hurting pain, sharp, stabbing pain up to the knee areas . . . ."  *Id*.  He also complained of numbness in his ankle and foot.  Dr. Bhalani observed that Whitford weighed 300 pounds. His blood pressure was elevated, reading 154/103. TR. 186.

Dr. Bhalani noted that Whitford exhibited positive paravertebral tenderness and positive left SI joint tenderness.  Straight leg raising on the right was about 70 to 75 degrees with radiating pain down to the legs.  TR. 186.  Dr. Bhalani's assessment was L4-L5 radiculopathy, facet joint hypertrophy, and herniated nucleus pulposus at L4-L5.  Dr. Bhalani recommended lumbar epidural injections.  *Id*.

In December 2003, Dr. Guirgis advised Whitford of the importance of weight control, diet, exercise, and stress management.  Whitford weighed 300 pounds, and his blood pressure was

152/90.  Dr. Guirgis cautioned Whitford to check his blood pressure regularly and report if it was greater than 140/90.  TR. 160.

On February 17, 2004, Dr. Guirgis treated Whitford for complaints of back pain and pain between his shoulder blades.  He prescribed Naproxen and another medication, the name of which is illegible TR. 182.

In April 2004, Dr. Guirgis noted that Whitford had sleep apnea, and referred him for a C-Pap-mask.  TR. 179.

On June 18, 2004, Whitford presented to Dr. Guirgis with complaints of cramping on his left side around his back.  TR. 175.  Dr. Guirgis' assessment was hypertension and hypokalemia.[10] Whitford weighed 296 pounds.  Dr. Guirgis again recommended weight control, diet, exercise, and stress management.  *Id*.

D.    *Reviewing Professionals*.

On November 7, 2002, an individual whose signature is illegible, reviewed Whitford's records and prepared a physical RFC assessment at the request of the SSA.  TR. 120-27.  This individual opined that Whitford could frequently lift ten pounds and occasionally lift twenty pounds.  He could stand or walk (with normal breaks) about six hours in an eight-hour workday.  He could sit for about six hours in an eight-hour workday.  His ability to push and/or pull was unlimited.  TR. 121.  This individual further opined that Whitford's complaints of pain were greater than the medical findings.  TR. 125.

_____

[10] "The presence of an abnormally small concentration of potassium ions in the circulating blood . . . ."  STEDMAN'S at 836.

On January 31, 2003, Thomas S. Edwards, M.D., reviewed Whitford's records and prepared a physical RFC assessment at the request of the SSA. TR. 129-36. Dr. Edwards opined that Whitford could frequently lift ten pounds and occasionally lift twenty pounds. He could stand or walk (with normal breaks) about six hours in an eight-hour workday. He could sit for about six hours in an eight-hour workday. His ability to push and/or pull was unlimited. TR. 130. Dr. Thomas opined that Whitford could only climb ladders, ropes or scaffolds, stoop, and crouch occasionally. TR. 131. Whitford was to avoid concentrated exposure to extreme cold and hazards, such as machinery and heights. TR. 133.

## IV.   STANDARD OF REVIEW.

This Court's review of a final decision issued by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence and whether the ALJ applied the correct legal standards. *McDaniel v. Bowen*, 800 F.2d 1026, 1029-30 (11th Cir. 1986). While a great deal of deference is paid to the ALJ's factual findings, "[n]o similar presumption of validity attaches to the [ALJ's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

The Court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the SSA's decision. *Id*. at 1000. Even if the Court finds that the evidence weighs against the SSA's decision, it must affirm if the decision is supported by substantial evidence. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The Court may not reweigh the evidence or substitute its own judgment for that of the SSA. *Id*. When reviewing a final decision issued by the SSA, this Court is authorized to "enter . . . a judgment affirming, modifying,

-12-

or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

To be entitled to Social Security disability benefits under OASDI, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). The Act provides further that a claimant is not disabled if he is capable of performing his previous work or, if "considering his age, education, and work experience, [he could] engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry which must be followed in determining whether a claimant is entitled to OASDI benefits.

In sum, when evaluating a claim for benefits under OASDI an ALJ must apply the following criteria, in sequence:

(1) Is the claimant presently unemployed?

(2) Is the claimant's impairment or combination of impairments severe?

(3) Does the claimant's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

(4) Is the claimant unable to perform his or her former occupation?

-13-

(5) Is the claimant unable to perform any other work within the economy?[11]

20 C.F.R. § 404.1520(a)(4).

An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g., McDaniel*, 800 F.2d at 1030.

## V.    ANALYSIS.

Whitford raises three issues on appeal.  First, Whitford argues that the ALJ erred by not utilizing Rule 202.06 of the grids to find him disabled based on his age and other relevant vocational factors.  Next, Whitford contends the ALJ's determination that he could perform full-time work is not supported by substantial evidence.  In closing, Whitford maintains the ALJ failed properly to evaluate his subjective complaints of pain. These are the only issues I will address.

   *A.    Failure to Rely Upon the Grids at Step Five.*

The grids consider a number of factors, including age, skills and education, to determine whether a person with exertional limitations on the ability to work is disabled.  In this case, Whitford was one month shy of his fifty-fifth birthday at the time the ALJ rendered his decision.  Whitford contends that the ALJ erred by treating him as "an individual closely approaching advanced age," which applies to individuals between fifty and fifty-four years old, rather than "a person of advanced age," which applies to individuals fifty-five years old and older.  20 C.F.R. §

---

[11] In an OASDI case, a claimant must also establish that he was disabled during the time that he was insured under the act.  *See* 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

404.1563(c)-(e).  Had the ALJ determined that Whitford fell in the advanced age category, §

202.06 of the grids would have directed a finding that he was disabled.

The SSA regulations provide that if a claimant is "within a few days to a few months of

reaching an older age category, and using the older age would result in a determination or decision

that you are disabled, we will consider whether to use the older age category after evaluating the

overall impact of all the factors of your case."  20 C.F.R. § 404.1563(b). In addition, the SSA

Hearings, Appeals, and Litigation Law Manual (HALLEX), which includes SSA Appeals Council

Interpretations, provides, in relevant part, as follows:

> To identify borderline age situations when making disability determinations, adjudicators will apply a two-part test:
>
> (1) Determine whether the claimant's age is within a few days or a few months of a higher age category.
>
> (2) If so, determine whether using the higher age category would result in a decision of "disabled" instead of "not disabled."
>
> If the answer to one or both is "no," a borderline age situation either does not exist or would not affect the outcome.  The adjudicator will then use the claimant's chronological age.
>
> If the answer to both is "yes," a borderline age situation exists and the adjudicator must decide whether it is more appropriate to use the higher age or the claimant's chronological age.  (Use of the higher age category is not automatic.)  To decide which age category to use, take a "sliding scale" approach. Under this approach, the claimant must show progressively more additional vocational adversity(ies) -- to support use of the higher age -- as the time period between the claimant's actual age and his or her attainment of the next higher age category lengthens.

HALLEX II-5-3-2.  Thus, use of the higher age range for the grids is not automatic when an

individual is in a borderline age range.

In this case, the record reflects that the ALJ considered that Whitford was nearly fifty-five years old when reaching his decision.  In his hypothetical question to the VE, the ALJ asked the VE to assume an individual "between the ages of 52 *and* 55" with no transferable skills.  TR. 205 (emphasis added).  The VE determined that this individual could perform work available in the economy, without drawing any distinction between individuals between 52 and 54 and individuals age 55.  Under these circumstances, the ALJ did not err by treating Whitford as  "an individual closely approaching advanced age" rather than  "a person of advanced age."

       B.     *Ability to Perform Substantial Gainful Activity*.

Whitford argues that the ALJ's RFC assessment reflects that he cannot perform substantial gainful activity because the ALJ determined that he could sit two and one-half hours a day, stand two hours a day, and walk one and one-half hours a day, for a total of six hours of work each day.  Pursuant to Social Security Ruling (SSR) 96-8p "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  1996 WL 374184, at *1 (July 2, 1996).

The Commissioner correctly asserts that Whitford's argument is based on a incorrect reading of the ALJ's decision.  The ALJ found that Whitford would need the ability to alternate between sitting and standing during the day.  Therefore, he concluded that Whitford could "sit for 2 ½ hours *at a time*, stand 2 hours *at a time*, and walk up to 1 ½ hours."  TR. 18 (emphasis added).  The ALJ did not limit the total amount of time that Whitford could sit or stand during an eight-hour day.  Rather, he simply found that each period of sitting should be limited to no more than

-16-

two and one-half hours and each period of standing should be limited to no more than two hours. Accordingly, Whitford's position on this issue is unavailing.

   *C.*  *Complaints of Pain.*

   Whitford's final argument is that the ALJ failed to articulate specific and adequate reasons for finding that Whitford's testimony about the limitations arising from pain were not entirely credible.  Once again, this argument is based on an incorrect reading of the ALJ's decision.

   In considering the intensity and persistence of Whitford's pain and other symptoms, the ALJ cited specific reasons based on the medical records and Whitford's ability to work part-time at various events for the police department as a basis for concluding that his pain was not as limiting as he represented it to be.  The ALJ's stated reasons are largely supported by substantial evidence in the record: treatment records following the use of epidural steroid injections reflect that Whitford's pain was treated with Naproxen, which is used to treat mild to moderate pain; none of Whitford's treating physicians opined that he could not work; and Whitford acknowledged being able to perform some work directing traffic after the point that he allegedly became disabled. The ALJ also indicated that Whitford's hypertension was considered stable, which is not an entirely accurate reading of the record: Whitford's hypertension was controlled in October 2002, but his blood pressure readings were very high in 2003 and 2004.  However, after disregarding the reference to Whitford's hypertension being controlled, the ALJ articulated sufficient reasons supported by substantial evidence in the record to support his conclusions about the limitations arising from Whitford's pain and other subjective symptoms. Accordingly, the ALJ did not err in his assessment of Whitford's credibility.

## VI.   CONCLUSION.

For the reasons set forth herein, it is **ORDERED** that the decision of the Commissioner is

**AFFIRMED**.   The Clerk of Court is directed to issue a judgment consistent with this Order and,

thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida this 19th day of May, 2006.

*Karla R. Spaulding*
_____
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties